THE SECOND NATIONAL BANK OF JERSEY CITY

*v.*

MICHAEL O'ROURKE et al.

1. Evidence, to be believed, must not only proceed from the mouth of a credible witness, but must be credible in itself.

2. A vendee, in order to be able to maintain his title against the creditors of his vendor, must not only be a purchaser for value, but a purchaser in good faith.

On final hearing on bill and answer and proofs taken in open court.

*Mr. Theodore Ryerson* and *Mr. Gilbert Collins,* for complainants.

*Mr. John A. McGrath* and *Mr. Stephen B. Ransom,* for defendants.

VAN FLEET, V. C.

This case involves simply the decision of a question of fact. The complainants are judgment creditors of Michael O'Rourke, and as such have filed their bill, asking that two instruments which he executed may be set aside as fraudulent against creditors. The first is a mortgage made by him to his two sons, Michael J. and John O'Rourke, bearing date March 1st, 1883, to secure $3,500, on two houses and lots situate in Jersey City; and the second is a bill of sale, bearing the same date, made by him to his son Michael J., by which he transferred a stock of groceries and everything else belonging to the grocery business theretofore carried on by him, together with all sums of money which were owing to him in that business. The complainants charge that both these instruments are fraudulent as to creditors. Whether they are or not is the only question in dispute.

The history of the consideration of the mortgage is a very remarkable one. The mortgagees are two of eight children of the mortgagor. He has had two wives. By the first he had four children, two sons and two daughters, and by the last he has also had four children. The mortgagees are the two sons by his first wife. At the date of the mortgage, Michael J. was twenty-two years of age, and John had just reached his majority. No consideration passed directly from them to their father, but their father makes this statement respecting the consideration of the mortgage. He is a shoemaker, and carried on the business of making and selling shoes, in a small way, from 1852 to 1882 or 1883; he had a bachelor brother, by the name of John, who was also a shoemaker, and who commenced working for Michael in May, 1852, and continued in his employ until his death, which occurred in March, 1878. John's wages were board and washing and $5 a week in money. In the management of the business John took as active a part as Michael; he made sales and collections and worked on the bench. He took from the moneys received in the store, for his own use, whatever he saw fit— Michael says, " I left it to himself; he could take $1,000, if he wanted it." No account was kept of the moneys received by John on account of his wages, and no settlement was made until 1876. Michael says John then asked for a settlement. A witness, produced by the defendants, and who swears he was present when John asked Michael to settle, testifies that John said to Michael that he was thinking of going to the old country for his health, and that having worked there for him a number of years he would like to have a settlement, to which Michael replied that he would settle with him. Michael says that John and he made a settlement shortly afterwards, which was not very exact, they had no accounts, but just bunched it, and agreed on $3,500, although the sum really due John was $400 or $500 in excess of that amount. Michael further says that immediately after agreeing on the amount due, he paid John $3,500, which sum John at once handed back to him, stating that he desired him (Michael) to hold the money in trust for his two boys, Michael J. and John, and give them a mortgage for it

when they became of age. Michael also says that although John lived for two years after the settlement, neither the money nor the trust was ever mentioned again until about a week before John's death, when John sent for him to come to his chamber where he lay sick, and that John then gave him his bank-book, and told him to draw some $60 or $65 standing to his credit in a savings bank, use the money for his burial, and to give the boys a mortgage, when he saw fit, for the $3,500, together with any balance which might be left of the money drawn from the bank. The defence claim that the mortgage in question was given in execution of this trust.

It must be admitted, if the history of the consideration of this mortgage, as thus given, is true, that the mortgage is valid, and should be upheld against the creditors of the mortgagor. The important question of the case is, Can this evidence be believed? Now, evidence, to be believed, must not only proceed from the mouth of a credible witness, but it must be credible in itself— such as the common experience and observation of mankind can approve as probable under the circumstances. We can have no test of the truth of human testimony, except its conformity to our knowledge, observation and experience. Whatever is repugnant to these belongs to the miraculous, and is outside of the limits of judicial cognizance. Evidence is generally considered improbable when it imputes to the parties to a transaction occurring in the ordinary course of human affairs, conduct inconsistent with the principles by which men, similarly situated, are usually governed.

John O'Rourke, at the time the settlement was made, was about fifty-one years of age; he was a native of Ireland; his health had failed—he had consumption—and he was thinking of returning to the old country. It was this thought that led him to desire a settlement. The $3,500—if any such sum was due to him—represented the strength of his manhood and constituted his all. The condition of his health would naturally make him solicitous about his future; fears would start unbidden in his mind that he would soon be totally disabled, and then he would realize that nothing would stand between him and want but his

accumulated eaarnings.   He knew not how many years were be-
fore him, nor what they were to be, whether they were to be
years of strength, or years of weakness and suffering.  And yet,
with all these incentives to the practice of a wise providence, it
is said that he was so improvident as to strip himself of every-
thing he had in the world.   And for what?   Few men, except
under the influence of a very powerful motive, will make them-
selves beggars just as they reach that condition of life when, as
they gaze at the future, the danger of want seems most immi-
nent and distressing.   John O'Rourke is not represented as a
man of inordinate affection.   He never evinced any special at-
tachment to the mortgagees; so far as appears he had no greater
love for them than for his•other nephews and nieces.   He is said
to have been a man of deeply religious nature and to have lived
a holy life.   If he had impoverished himself for his church, his
zeal for religion might have accounted for his act, but as it is his
extraordinary act stands without either motive or reason.

But, suppose it be conceded that an adequate motive existed,
or that the *cestuis que trust* are not obliged, in order to maintain
their mortgage, to show that the creator of the trust acted, in
creating it, with the prudence which usually marks the conduct
of men similarly situated, then the question will arise, Can it be
believed that an act of so much importance to the actor, as well
as to the persons whom he intended to benefit, would have been
done in the manner in which it is said this act was done?   Men
do not ordinarily dispose of $3,500, especially if it constitutes
all they have, with as little caution as they pull off their coats
or do any other insignificant act.   The story is that this man
hoarded his wages until he had accumulated $3,500, and then,
though well advanced in years and broken in health, he stripped
himself of all his property for the benefit of two of his nephews,
and he did this, too, at a time when there was nothing in their
condition which made such an act either necessary or desirable.
The act was the most important of his life, so far as it affected
his property interests.   He did not do it inconsiderately.   No
man does such an act without careful thought.   If Michael
O'Rourke tells the truth, this was a long-cherished desire of

John's heart, for he says John always told him that he intended
to leave whetever he owed him in his hands for his boys.    If
this is true, there can be no doubt that the project was one which
was very near John's heart—indeed, it would seem to have been
the great object of his life.    He would therefore naturally be
very anxious, when he came to lay plans for carrying it into
effect, to see to it that such precautions were adopted as would,
in his judgment, render the accomplishment of his purpose cer-
tain.    He might not have known what precautions were best to
that end, but if he was conscious of his ignorance, it is reasona-
ble to suppose that he would have sought counsel, or, if it is
believed that his secretive nature made him shrink from that
course, still, I think, we must regard it as certain that his desire
that his scheme should be faithfully executed would have in-
duced him, when he came to place the money in Michael's hands,
to have called a witness—for example, his confessor—to bear
testimony in case of Michael's death, or, in case pecuniary mis-
fortune should befall Michael, that he had made himself poor
to provide a bounty for his two nephews.    Nothing but an ex-
traordinary love could have prompted such improvident gener-
osity, and a love which is strong enough to induce one man to
make himself poor that another may enjoy his property, will
naturally guard its object with the most jealous care.    It will
be eager to erect bars against the intrusion of others, and, in its
zeal to protect its object, will adopt unnecessary safeguards.    Yet
nothing of that kind surrounds this act.    The $3,500 were
passed over with as little ceremony as would have marked the
transaction if the subject of the gift had been a dime, and this
important trust was created with less caution than most persons
would have observed in dealing with a matter involving one-
tenth of its pecuniary stake.

The transaction is, in other respects, a startlingly improbable
one.    Michael knew, long prior to his settlement, that John
intended to leave this money in his hands.    He swears, it will
be remembered, that John always told him such were his inten-
tions, yet, he says, the very moment that John and he agreed
upon the sum which should be paid, he, without inquiry whether

or not John wanted the money, and without making the slightest allusion to John's oft-repeated declaration that he intended to leave this money in his hands for his boys, paid John the money, and John thereupon at once handed the money back and created this trust. This was a very large sum of money for a person in Michael's circumstances to have at his command. He says he had had it in his house for about two weeks. If this is true, it is probably the only time in his life when he had so large a sum of money under his control for so long a period. But the most incredible feature of this part of the story is that, knowing, as he says he did, that John intended to leave this money in his hands, he should have paid John the money, and that John should have accepted it. Both the payment and acceptance are acts so utterly inconsistent with the purpose of one of the parties, and the understanding of both, that nothing short of a credulity which is incapable of drawing a distinction between the probable and improbable, can believe that they occurred. In addition, it should be noted that the evidence of Michael O'Rourke, in relation to this part of the transaction, given on different occasions, stands in strange contradiction. On his examination, under proceedings supplementary to the execution issued on the complainant's judgment, he testified that he paid John the $3,500 immediately after the settlement, and that John took the money and put it in his trunk, where he kept it for about four weeks, and then handed it back to him. On the trial of this case, he testified, it will be remembered, that John returned the money to him on the very day of the settlement, and immediately on its being handed to him.

But, again: By the terms of the trust, the money was to be held for the *cestuis que trust* until they reached the age of twenty-one years, and then the trustee was not to pay the money, but to give the *cestuis que trust* a mortgage on it. And Michael O'Rourke swears that the reason John assigned for this provision of the trust was, that the woman who was then his wife was not the mother of the *cestuis que trust*. It is impossible for my mind to follow this reasoning. If John wanted Michael's two sons to have the $3,500 when they reached their

7

majority, I cannot understand why he should not have directed that the money should be paid to them at that time, nor how the fact that Michael's wife was not their mother could have had the slightest influence on John's mind, in deciding what the terms of the trust should be.   And it is equally difficult for me to understand how or why John should have thought of a mortgage in connection with his gift.   The proofs render it quite certain that John had never held such a security.   He knew nothing about mortgages.   His nephews, and not his brother, were the objects of his bounty, and the natural and most direct way for him to have effected his purpose, and the one which would have been most likely to suggest itself to a man of his knowledge and experience, was to have directed that the money should be paid to his nephews when they reached full age.   The reason assigned for this provision of the trust is so absurd, and the provision itself is so manifestly unnatural, under the circumstances, as to place the whole story of the defence, when its other improbable features are considered, beyond the scope of a rational credulity.

From the fact that an attempt has been made to maintain this mortgage on a false consideration, the conclusion is irresistible that it has no consideration.   To my mind it is clear that it was executed to defraud the creditors of the mortgagor.

The discussion of the other question—whether the bill of sale is entitled to be upheld as valid against the complainants or not —need not be extended.   Both instruments were executed at the same time and were parts of the same transaction, and were doubtless the outgrowth of the same purpose.   By them, a debtor who was hopelessly insolvent, and against whom his creditors had just instituted suits, stripped himself of all his property, and placed two of his sons, who were members of his family and without means, in a position where, if the instruments are given effect according to their terms, they will take all his property and render any effort by his creditors to collect their debts abortive.   The character of one of these instruments has already been defined.   There can be little doubt that the bill of sale was executed for the same fraudulent purpose.   But, it is

Hodge's Executors *v* Amerman.

said, the proofs show that the bill of sale was founded on a full consideration, actually paid. They do so show, but they also show something more. They show that the vendee was so eager to become the purchaser of the property, that, though the vendor was his debtor in a sum nearly double the amount he agreed to pay for the property, he borrowed the money to make the purchase. But Michael J. O'Rourke, in order to maintain his title against the complainants,' must be something more than a purchaser for value—he must be a purchaser in good faith. A vendee who purchases, knowing that the purpose of the vendor in selling is to place his property beyond the reach of his creditors, and he buys under circumstances which show that he was a participant in his vendor's fraud, acquires a title which the vendor's creditors may successfully impeach. *Green* v. *Tantum, 4 C. E. Gr. 105 ; S. C. on appeal, 6 C. E. Gr. 364 ; Schmidt* v. *Opie, 6 Stew. Eq. 138.* The father's purpose in this transaction is perfectly obvious. There can be no doubt that the son knew all about it and was something more than a willing instrument in the hands of his father.

The complainants are entitled to a decree declaring both instruments void as to them. They also are entitled to costs.